IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE WILDERNESS SOCIETY, 1615 M Street, NW, Washington, DC 20036; IZAAK WALTON LEAGUE OF AMERICA, 707 Conservation Lane, Gaithersburg, MD 20878; and CENTER FOR BIOLOGICAL DIVERSITY, P.O. Box 710, Tucson, AZ 85702-0710, | ) ) ) ) ) ) | Case No. |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | |
| RYAN ZINKE, in his official capacity as Secretary of the Interior, 1849 C Street NW, Washington, DC 20240; MITCHELL LEVERETTE, in his official capacity as Acting Eastern States Director for the Bureau of Land Management, 20 M Street SE Suite 950, Washington, DC 20003; JOSEPH BALASH, in his official capacity as Assistant Secretary for Land and Minerals Management for the U.S. Department of the Interior, 1849 C Street NW, Washington, DC 20240; BUREAU OF LAND MANAGEMENT, 1849 C Street NW, Rm. 5665, Washington, DC 20240; and U.S. DEPARTMENT OF THE INTERIOR, 1849 C Street NW, Washington, DC 20240; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(5 U.S.C. §§ 701-706; 16 U.S.C. § 508b; 16 U.S.C. § 520; Sec. 402 of Reorganization Plan No. 3
of 1946; 43 U.S.C. § 1732)

SUMMARY

1.      This action challenges an attempt by the Bureau of Land Management to rescind a final decision issued nearly one and a half years previously.  The Bureau's previous decision, dated December 15, 2016, denied an application from Twin Metals Minnesota to renew two hardrock mineral leases, MNES 01352 and MNES 01353 ("the Leases"), adjacent to the Boundary Waters Canoe Area Wilderness in the Superior National Forest.  As a result, the Leases expired.  However, on May 2, 2018, the Bureau purported to 1) rescind its December 2016 decision; 2) reinstate the version of the Leases that was in place at the time; and 3) reinstate Twin Metals' renewal application ("the Rescind/Reinstate Decision").  This action challenges the Rescind/Reinstate Decision as being beyond the Bureau's authority and arbitrary.

2.      The Boundary Waters is the most visited wilderness in the United States, a 1,098,000-acre wilderness in the Superior National Forest in northeastern Minnesota treasured for its unique lakeland habitat.  There is a direct hydrological connection between the Leases and the Boundary Waters.

3.      Twin Metals intends to use the Leases to develop an underground copper-nickel sulfide ore mine.  If built, such a mine would threaten the Boundary Waters with contamination and degradation.  On December 14, 2016, the United States Forest Service informed the Bureau in a detailed and well-supported letter that the risk to the Boundary Waters from a copper-nickel sulfide ore mine is too great.  The Forest Service, as the agency responsible for managing the surface of the leased land and the Boundary Waters, therefore denied its consent to the Leases. The Forest Service's denial of consent was the basis for the Bureau's December 15, 2016, denial of Twin Metals' renewal application.

4.      There is no statutory, regulatory, or inherent authority for the Bureau's rescission of its December 15, 2016, decision denying Twin Metals' lease renewal application almost a year and a half after that decision became final.  Furthermore, the Bureau's May 2, 2018, decision is arbitrary and capricious because it is based on an unprecedented, erroneous interpretation of the Leases by the United States Department of the Interior, Office of the Solicitor ("the Solicitor").  For both of these reasons, the Bureau's rescission of its previous decision is unlawful.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.  Judicial review is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

6.      Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

7.      Plaintiff The Wilderness Society, founded in 1935, is a national, non-profit membership organization devoted to protecting wilderness and inspiring Americans to care for wild places.  It has led the effort to permanently protect 109 million acres of wilderness and ensure sound management of our shared national lands.  The Wilderness Society has more than 1 million members and supporters, including over 2,600 members and 7,200 supporters in Minnesota, and has long worked to protect the Boundary Waters.  A member of the Campaign to Save the Boundary Waters, The Wilderness Society has advocated for permanent protection of the Boundary Waters watershed from the threat of sulfide-ore copper mining, and has worked to inform the public about threats to the Boundary Waters, including with its 2017 report "Too Wild to Drill."  Members and staff of The Wilderness Society regularly visit the Boundary

Waters and surrounding Superior National Forest lands to paddle, hunt, fish, harvest wild rice, and enjoy the splendor of the areas' pristine lakes, rivers, and forests.

8.      Plaintiff Izaak Walton League of America ("the League") is a non-profit membership organization devoted to conserving outdoor America for future generations.  The League has more than 42,000 members and about 230 community-based chapters nationwide, including over 1,000 members in Minnesota.  League members pledge "[t]o strive for the purity of water, the clarity of air, and the wise stewardship of the land and its resources; to know the beauty and understanding of nature and the value of wildlife, woodlands, and open space; to the preservation of this heritage and to man's sharing in it."  Beginning in about 2009, the League has worked to educate its members, the public, state and federal administrative agencies, and legislators about the potential impacts of copper-nickel mining in Minnesota by holding public forums, submitting comments and petitions, sponsoring and hosting informational events, litigating, meeting with agency decisionmakers, joining the Campaign to Save the Boundary Waters, and working with several other Minnesota organizations.  In 2016, the League spoke against renewing the Leases at a Forest Service listening session and submitted petitions to the Forest Service asking that the Leases not be renewed.

9.      Plaintiff Center for Biological Diversity ("the Center") is a non-profit organization with over 63,000 members, with offices in Duluth and Minneapolis, Minnesota, as well as Arizona, California, Oregon, Washington, and a number of other states.  The Center works to ensure the long-term health and viability of animal and plant species across the United States and elsewhere, and to protect the habitat these species need to survive.  The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  The Center has advocated for northeastern Minnesota's animal

and plant species in administrative processes and in court, including by commenting on mining-related proposals, petitioning for Endangered Species Act protections for the Minnesota moose population, and joining litigation over proposed mining that would destroy habitat for Canada lynx and gray wolves in the Superior National Forest.  The Center is a partner in the Campaign to Save the Boundary Waters.

10.  Members of plaintiff groups, including John Ipsen and Jon Nelson, members of The Wilderness Society and Izaak Walton League, and Collette Adkins, a member of the Center for Biological Diversity, regularly use and enjoy—and intend to continue to use and enjoy, including this summer—the Boundary Waters, the leased land, and/or areas surrounding the leased land for various purposes, including recreation, wildlife viewing, education, research, photography, and/or esthetic and spiritual enjoyment.  These and other members of plaintiff groups also enjoy or otherwise use migratory wildlife, fish, and birds from the Boundary Waters, the leased land, and/or areas surrounding the leased land.

11.  The Bureau's May 2, 2018, Rescind/Reinstate Decision directly and imminently injures plaintiff groups' members' interests.  When the Bureau denied Twin Metals' renewal application on December 15, 2016, the Bureau instructed the company to remediate existing boreholes and remove equipment from the Leases.  Twin Metals has not fulfilled that obligation. Twin Metals' and its predecessors' past mineral activities on the Leases have left remnants of industrial activities on the site, including large pipes sticking up out of the ground and an unsightly bulk sample site, never fully remediated.  Reinstating the Leases removes Twin Metals' obligation to restore the leased public lands to a state suitable for other public uses. Reinstating the Leases also entitles Twin Metals to casual use of the leased lands, and to request permits for more extensive use of the leased lands under the purportedly valid mineral Leases.

Since the Rescind/Reinstate Decision, Twin Metals has requested permission to drill additional wells on the leased land.  Twin Metals has installed gates at entrances to public land on the Leases.  These industrial activities and the ongoing failure to return the leased land to its previous condition interfere with plaintiffs' members' use and enjoyment of the leased land and surrounding lands by blocking access, and by causing noise, increased traffic, disturbance of wildlife, water quality reductions, and a landscape that is visibly degraded.  These circumstances dissuade plaintiff groups' members from visiting the leased land and surrounding lands, including the two nearby Boundary Waters entry points, and reduce the value of their experiences when they do visit.

12.     The Rescind/Reinstate Decision interferes with plaintiffs' members' use and enjoyment of the leased land and surrounding lands by providing additional justification for Twin Metals' mineral activity on state and federal public lands near the Leases.  Twin Metals stated in a press release about the Rescind/Reinstate Decision that the Leases are "important components" of an underground mine project proposal.  These industrial activities on state and federal public lands near the Leases interfere with plaintiffs' members' use and enjoyment of the leased land and surrounding lands by blocking access to public lands, and by causing noise, increased traffic, disturbance of wildlife, water quality reductions, and a landscape that is visibly degraded.

13.     The Rescind/Reinstate Decision injures plaintiff groups' members' interests by making it likely that Twin Metals will develop a copper-nickel sulfide ore mine on the Leases.  Following the Rescind/Reinstate Decision, Twin Metals stated that it is preparing a formal mine proposal to submit soon to state and federal agencies.  A copper-nickel sulfide mine on the Leases would cause long-term harm to plaintiff groups' members' interests in the leased land and

surrounding lands, including the Boundary Waters and the two nearby Boundary Waters entry points, through increased noise, increased traffic, and visible degradation of the landscape on the Leased lands.  It would damage plaintiff groups' members' esthetic, recreational, and other interests in the leased lands, the surrounding lands, and the Boundary Waters by causing ecological harm and creating an ongoing risk of additional ecological harm in those areas. Ecological harm would include degradation of water quality and its numerous indirect effects on fish, plants, and animals; loss of habitat due to occupation by mine facilities; disturbance of wildlife by noise and traffic; increased risk of the spread of invasive species; and degradation of air quality.  Acid mine drainage is likely to occur, further decreasing water quality and multiplying harmful indirect effects to plants and animals.  Collectively, these impacts would degrade the wilderness character of the Boundary Waters, including by fouling its pristine and interconnected waterways, disturbing its outstanding opportunities for solitude and primitive recreation, and diminishing its untrammeled, natural appearance.  A mine would also deprive plaintiff groups' members of access to the leased lands during the life of the mine, if not beyond. These harms are imminent and flow from the Rescind/Reinstate Decision.

14.     The defendants' unlawful actions adversely affect plaintiffs' organizational interests in their members' use and enjoyment of the Boundary Waters, the leased land, and areas surrounding the leased land.  The Bureau's May 2, 2018, Rescind/Reinstate Decision will directly injure these interests.

15.     Each of the plaintiff groups monitors the integrity of the Boundary Waters ecosystem and activities in the Boundary Waters and the surrounding area that threaten the integrity of the Boundary Waters ecosystem.  Each of the plaintiff groups monitors compliance with the law respecting the Boundary Waters and surrounding lands, educates its members and

the public concerning the management of these lands, and advocates policies and practices that

protect the natural values and sustainable resources of these lands.  It is impossible to achieve

these organizational purposes fully without adequate information and public participation in the

processes required by law for the management of these lands, and without appropriate

administrative and legal repose in this context.  The interests and organizational purposes of the

plaintiffs will be directly and irreparably injured by defendants' violations of law as described in

this complaint.

16.     Laws require the Bureau to consider wilderness, habitat, recreational, spiritual,

non-extractive business, and other non-mining values on public lands when deciding whether to

authorize mineral activity where the Leases are located.  16 U.S.C. § 508b; *id.* § 520; Sec. 402 of

Reorganization Plan No. 3 of 1946; 43 C.F.R. § 3507.19(b); 43 U.S.C. § 1732(a).  The Federal

Land Policy and Management Act also requires the Secretary of the Interior, acting through the

Bureau, "[i]n managing the public lands . . . [to] take any action necessary to prevent

unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).  Before authorizing

mineral activity where the Leases are located, the Bureau is required by law to obtain the consent

of the Forest Service, 16 U.S.C. § 508b, which has statutory duties to consider wilderness,

habitat, recreational, spiritual, non-extractive business, and other non-mining values on National

Forest System Lands in managing National Forest System Lands, *see* 16 U.S.C. § 1600(2), (3),

and to preserve the wilderness character and values of the Boundary Waters, Pub. L. 95-495, 92

Stat. 1649 (1978), including by protecting the Boundary Waters from potentially harmful

external activities.  16 U.S.C. § 1133(b).  The laws described in this paragraph protect the

interests of the plaintiff groups and their members in the Boundary Waters, the leased land, and

the areas surrounding the leased land.

DEFENDANTS

17.     Defendant Ryan Zinke is sued in his official capacity as Secretary of the Interior. Secretary Zinke heads the United States Department of the Interior, the Cabinet-level agency responsible for the Rescind/Reinstate Decision.

18.     Defendant Mitchell Leverette is sued in his official capacity as Acting Eastern States Director for the Bureau of Land Management.  Mitchell Leverette was the first Bureau official to sign the Rescind/Reinstate Decision.

19.     Defendant Joseph Balash is sued in his official capacity as Assistant Secretary for Land and Minerals Management for the United States Department of the Interior.  Joseph Balash signed the Rescind/Reinstate Decision after Mitchell Leverette, concurring in that decision and making it final agency action.

20.     Defendant Bureau of Land Management is an agency of the United States Department of the Interior authorized to allow mining on the land covered by the Leases on behalf of the Secretary of the Interior if it is in the best interests of the United States, and with the consent of the Secretary of Agriculture.

21.     Defendant United States Department of the Interior is a Cabinet-level agency that manages the country's natural and cultural resources.

FACTS

I.     MINING ON THE LEASES WOULD POSE SERIOUS RISKS TO THE BOUNDARY WATERS CANOE AREA WILDERNESS.

22.     The Boundary Waters is a 1,098,000-acre wilderness in the Superior National Forest in northeastern Minnesota.  It is the most visited wilderness in the United States.  The Boundary Waters contains over a thousand lakes, over 1,200 miles of canoe routes, and two thousand campsites.  Visitors canoe the wilderness, as well as fish, hike, camp, ski, dog sled,

harvest wild rice and other edible wild plants, and hunt.  Outfitters, guides, and other Minnesota

businesses cater to visitors of the Boundary Waters, who generate about $44.5 million annually

in economic benefits to the region.  The Boundary Waters provides important habitat for loons,

pike, trout, walleye, grouse, eagles, great gray owls, moose, deer, beavers, bears, wolves,

bobcats, lynx, bats, waterfowl, over a hundred species of migratory breeding birds, and many

other kinds of wildlife, including three species listed as threatened under the Endangered Species

Act, 16 U.S.C. §§ 1531-1544.  The United States Fish and Wildlife Service has designated the

Boundary Waters and most of the Superior National Forest as critical habitat for the threatened

Canada lynx.

23.     For nearly a century, Congress and the Executive Branch have recognized that the

Boundary Waters is a resource of national importance worthy of special consideration and

protection.  In 1909, President Theodore Roosevelt created the Superior National Forest from

previously withdrawn public domain lands, including parts of the modern Boundary Waters.  In

1926, United States Secretary of Agriculture W. M. Jardine set aside 640,000 acres of the

Superior National Forest as roadless wilderness, writing "[t]he purpose of this program is to

conserve the value of the Superior National Forest as a game and fish country . . . .  Not less than

one thousand square miles containing the best of the lakes and waterways will be kept as

wilderness recreation areas."  In 1938, the Forest Service established the Superior Roadless

Primitive Area, whose boundaries were similar to the modern Boundary Waters and whose name

was eventually changed to the Boundary Waters Canoe Area.  In 1964, Congress passed the

Wilderness Act "to secure for the American people of present and future generations the benefits

of an enduring resource of wilderness," making the Boundary Waters Canoe Area part of the

new National Wilderness Preservation System.  16 U.S.C. § 1131(a).  In 1978, Congress passed

the Boundary Waters Canoe Area Wilderness Act ("Boundary Waters Act"), which expanded and enhanced protections for the Boundary Waters and added a Mining Protection Area. Pub. L. No. 95-495, 92 Stat. 1649 (1978). Congress recognized "the special qualities of the area as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation," and sought among other things to "minimize to the maximum extent possible, the environmental impacts associated with mineral development affecting" the Boundary Waters and Mining Protection Area. *Id.*, §§ 1-2.

24.     The Superior National Forest, including the Boundary Waters, is an outstanding fresh water resource. The Superior National Forest holds 20 percent of the fresh water in the entire National Forest System. These water-rich Minnesota forests purify water, sustain surface and ground water flow, maintain fish habitat, control erosion, and stabilize streambanks.

25.     The Leases are adjacent to the Boundary Waters and are in the Rainy River watershed shared by the Boundary Waters. The Leases include approximately 4,864 acres of land in the Superior National Forest on either side of Minnesota Highway 1, southwest of Ely, Minnesota. Specifically, MNES 01353 lies immediately southwest of Boundary Waters entry points 32 and 33, which are at the South Kawishiwi River and Little Gabbro Lake, respectively. MNES 01352 is three miles to the southwest of those entry points, straddling the eastern end of Birch Lake, and extending along the south side of the South Kawishiwi River. Surface water in the leased area drains directly into the Boundary Waters and from there into Voyageurs National Park and the Quetico Provincial Park in Ontario, Canada.

26.     Twin Metals intends to develop a copper-nickel sulfide ore mine on the Leases. A copper-nickel sulfide ore mine on the Leases would threaten the integrity of water resources in the Superior National Forest, including the Boundary Waters. The hydrogeology and high

degree of interconnectedness of water bodies in northeastern Minnesota makes the area especially susceptible to degradation of water quality.  Surface waters of northeastern Minnesota are especially sensitive to changes in pH, acid deposition, and acid runoff.  Unlike in some other regions, the bedrock, surficial deposits, and soils of northeastern Minnesota have little capacity to neutralize acids.

27.     Mining in sulfide-bearing mineral deposits causes acid mine drainage.  When sulfide in rock is exposed to air and water by mining, it produces a chemical reaction that creates sulfuric acid.  Sulfuric acid then leaches heavy metals from the rock.  When water collects the acid and metals and then drains or leaches from the mine site, the process is called acid mine drainage.  All major elements of a mining operation can produce acid mine drainage.  Hardrock mining in sulfide-bearing mineralizations is known worldwide for producing acid mine drainage that requires continuous management and perpetual treatment.  With this continuous management and perpetual treatment come a perpetual risk of contamination due to treatment or containment failure, insolvency, political events, geological events, and weather events.  Acid mine drainage can adversely affect fish populations and aquatic ecosystems by both direct effects on aquatic life and indirect effects on food supplies and habitat.

28.     In the event that the Boundary Waters is contaminated by acid mine drainage from a copper-nickel sulfide ore mine on the Leases, it is unlikely that the damage could be successfully remediated.  All or almost all of the methods available to remediate acid mine drainage would cause additional damage the Boundary Waters' ecosystem, watershed, and wilderness values.

29.     In the December 14, 2016, letter withholding its consent to renewal of the Leases, the Forest Service found that developing a copper-nickel sulfide ore mine on the Leases would

pose an unacceptable risk to the Boundary Waters of pollution from acid mine drainage.  The

Forest Service found that "any degree of contamination of the [Boundary Waters] by [acid mine

drainage] and leached metals has the potential to seriously degrade the wilderness area's

character and quality" and that, if the Boundary Waters is contaminated, it is unlikely the

pollution can be effectively remediated in a manner consistent with the Boundary Waters'

wilderness character.  The Forest Service also found that developing a mine on the Leases could

cause habitat fragmentation and degradation harmful to migratory wildlife species that use the

Boundary Waters.

II.     THE BUREAU ISSUED THE LEASES FOR TWENTY YEARS, AND THEN
        GRANTED TWO TEN-YEAR RENEWALS.

        30.     The Bureau originally issued leases MNES 01352 and MNES 01353 to the

International Nickel Company, Inc. on June 14, 1966, for a primary term of twenty years.  The

purpose of the Leases was to grant an exclusive right to mine for nickel, copper, and associated

minerals on the leased land.  After the Bureau granted the Leases to the International Nickel

Company, the Leases were assigned to new entities three times.  Twin Metals is now the

successor in interest of the International Nickel Company with respect to the Leases.  No lessee

has developed a mine or begun any mineral production on the Leases.  There is no record

showing that the Forest Service consented to the Leases prior to June 14, 1966.

        31.     On May 14, 1986, the lessee applied to renew the Leases.  On June 8, 1986, the

Bureau requested that the Forest Service advise the Bureau whether the Forest Service had any

objections to renewal of the Leases.  On June 19, 1987, the Forest Service consented to renewal

of the Leases for a ten-year period.  The Bureau renewed the Leases for a ten-year period

effective July 1, 1989.

32.     On March 25, 1999, the Bureau requested the Forest Service's recommendation regarding a second request by the lessee to renew the Leases.  On July 18, 2003, the Forest Service replied that it had no objection.  The Bureau renewed the Leases for a second ten-year period on January 1, 2004.

33.     On October 21, 2012, Twin Metals applied for a third renewal of the Leases.

III.    THE DEPARTMENT OF THE INTERIOR FOUND THAT THE 2004 LEASES PRESERVED THE BUREAU'S DISCRETION TO DENY RENEWAL, AND THE BUREAU DENIED RENEWAL.

34.     At some time prior to March 8, 2016, the Bureau requested a Solicitor's opinion on whether the Bureau had discretion to grant or deny Twin Metals' October 21, 2012, application to renew the Leases.  On March 8, 2016, Solicitor Hilary Tompkins issued Memorandum M-37036 ("Tompkins Opinion"), wherein the Solicitor, consistent with earlier advice, concluded that the Bureau had discretion to grant or deny the most recent renewal request.

35.     The Tompkins Opinion relied primarily upon the conclusion that the Leases as renewed in 2004 are the operative contracts and are preference right leases, meaning there is no guarantee of renewal.  The 2004 version of the Leases is titled "PREFERENCE RIGHT LEASE RENEWAL."  The Leases provided that they were issued "with preferential right in the lessee to renew for successive periods of 10 years under such terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the expiration of any period."  The lessee signed this 2004 version of the Leases.

36.     The Tompkins Opinion explained that the Department of the Interior's consistent interpretation of a "preferential right" to renew, including as that term is used in the standard lease form on which the Bureau executed the 2004 renewals, is that it is not a guarantee of lease

renewal.  Under such a preference right lease, the Bureau has the discretion to deny lease

renewal, even if the lessee is meeting all of its lease obligations.  A preference right lease for

hardrock minerals simply and only gives the lessee a right to be preferred over others if the

Bureau grants lease renewal.

37.     The Tompkins Opinion rejected an argument Twin Metals had made that the

operative terms and conditions were those contained in the 1966 version of the Leases, rather

than the actual terms included in the 2004 Leases signed by the lessee.  Twin Metals' argument

was based on extrinsic evidence about the circumstances surrounding the 1989 renewal of the

Leases.  Solicitor Tompkins determined that "rely[ing] on extrinsic evidence to attempt to negate

the 2004 lease terms does not comply with the law of contracts," explaining that, "[t]he 2004

leases are each complete, integrated documents that contain all necessary lease terms and are

duly signed by the lessee and lessor."

38.     Although Solicitor Tompkins determined that it was not appropriate to rely on

prior versions of the lease and the course of dealings, she concluded that the result would be the

same even if they were considered.  Solicitor Tompkins noted that section five of the 1966

Leases allows for a one-time, ten-year extension of the initial twenty-year deadline for

commencement of the mineral production necessary for renewal on the same terms and

conditions as the 1966 Leases.  She concluded that the Bureau granted the 1989 renewal in

conjunction with such an extension, which would have been consistent with the Solicitor's

advice at the time.

39.     In Solicitor Tompkins' analysis, the 2004 renewal was the first renewal not

associated with an extension of the deadline for commencement of production.  Thus, Solicitor

Tompkins concluded that because the lessee had not commenced production, the Bureau had

discretion in 2004 to impose new terms and conditions, and did so, changing the renewal term, among others.

40.     In light of Solicitor Tompkins' conclusion that the Bureau had discretion to deny the lessee's third application to renew the Leases, on June 3, 2016, the Bureau requested a decision from the Forest Service on whether it consented to a third renewal.  The Forest Service solicited public input on the issue and held two listening sessions in Minnesota.  On December 14, 2016, after months of deliberation, the Forest Service responded to the Bureau by withholding consent to the third renewal of the Leases.  In its response, the Forest Service cited the irreplaceable nature of the Boundary Waters and the potentially extreme risks to the Boundary Waters that would be posed by a copper-nickel sulfide ore mine on the Leases.  The Forest Service concluded that failing to prevent damage to the Boundary Waters that could be caused by mining on the Leases would be inconsistent with its obligations under the Boundary Waters Act.

41.    On December 15, 2016, the Bureau rejected Twin Metals' October 2012 application to renew the Leases, citing the Forest Service's denial of consent.  Pursuant to the Bureau's own regulations, the Leases expired upon Twin Metals' receipt of the Bureau's decision rejecting the application.  *See* 43 C.F.R. § 3514.25(a).  The Bureau directed Twin Metals to remove equipment from the leased area and remediate existing boreholes.

IV.    THE DEPARTMENT OF THE INTERIOR REVERSED COURSE AND REINSTATED THE LEASES.

42.     On December 22, 2017, more than a year after the Leases expired and more than five years after the last renewal application, Principal Deputy Solicitor Daniel Jorjani issued a new opinion about the Leases, Memorandum M-37049 ("Jorjani Opinion").  The Jorjani Opinion

withdraws and replaces the Tompkins Opinion, and, contrary to the Tompkins Opinion, concludes that the Bureau had no discretion to deny Twin Metals' 2012 renewal request.

43.     The Jorjani Opinion determined that it is necessary to look outside the plain language of the 2004 Leases to determine whether the Bureau had discretion to deny Twin Metals' 2012 renewal application.  Principal Deputy Solicitor Jorjani noted that the 2004 Leases contain no integration clause, and argued the 2004 Leases are ambiguous because it is unclear precisely which parts of the 1966 Leases are incorporated.  In fact, the 2004 Leases specify which parts of the original Leases are incorporated.  Section 14 of the 2004 Leases, titled "SPECIAL STIPULATIONS," states:

> * The terms and conditions of the production royalties remains [sic] as stated in the attached original lease agreement.
>
> ** The minimum annual production and minimum royalty is $10.00 per acre or a fraction thereof as stated in the attached original lease agreement.

In section 2 of the 2004 Leases, which contains standard "PRODUCTION ROYALTIES" and "MINIMUM ANNUAL PRODUCTION AND MINIMUM ROYALTY" terms, a corresponding "*" and "**" appear, referencing the special stipulations.  The 2004 Leases do not state or otherwise signify that any *renewal* term from the 1966 Leases is incorporated, or that any term from the 1966 Leases is incorporated other than the production royalty and minimum annual production and minimum royalty terms.  Several terms of the 2004 Leases revise, add to, or even expressly contradict—and thus replace—the 1966 Lease terms, including the preference right renewal terms.

44.     Determining that he could ignore the language of the 2004 Leases, Principal Deputy Solicitor Jorjani concluded that evidence extrinsic to the 2004 Leases indicates the Bureau intended the 2004 Leases to be on the same terms and conditions as the 1966 Leases.

Based on communications between the Bureau and the lessee and within the Bureau, Principal

Deputy Solicitor Jorjani concluded that the Leases were renewed in 1989 on the same terms and

conditions as the original Leases.  Prior to the 1989 renewal, the Bureau initially offered leases

on substantially different terms than the 1966 Leases.  These leases were only preference right

leases and had numerous different terms, including new royalty provisions.  After exchanges

with the lessee, the Bureau reverted to the original 1966 royalty provisions, but retained in the

1989 renewals the new preference right lease terms.  On several occasions during these

exchanges, Bureau staff had commented that renewal would be on the same terms and conditions

as the 1966 Leases.  Ultimately, in 1989, the Bureau transmitted a renewal copy with preference

right renewal terms virtually identical to the 2004 Leases and the lessee signed the renewal.

Based only on some statements by Bureau staff at the time and ignoring the plain language of the

Leases as issued and signed in 1989, the Jorjani Opinion concluded the 1989 renewal was on

exactly the same terms as the 1966 leases.

45.     Because the 1989 and 2004 versions of the Leases are nearly identical, Principal

Deputy Solicitor Jorjani concluded that the 2004 renewal of the Leases was also on the same

terms and conditions as the 1966 Leases.  Principal Deputy Solicitor Jorjani also interpreted the

1966 Leases as creating a right to unlimited successive 10-year renewals.  Therefore, the Jorjani

Opinion concluded that the Twin Metals had a right to renew in 2012, and that the Bureau did

not have discretion to deny Twin Metals' renewal application.

46.     On May 2, 2018, more than 18 months after the Leases expired, the Bureau issued

the Rescind/Reinstate Decision that is the subject of this complaint, purporting to rescind its

December 15, 2016, decision denying Twin Metals' 2012 application to renew the Leases.  At

the same time, the Bureau reinstated the Leases as written in 2004, as well as Twin Metals' 2012

COMPLAINT
*The Wilderness Society et al. v. Zinke et al.,*
Case No.                                                                                    17

application to renew the Leases.  The Bureau adopted the conclusions in the Jorjani Opinion as

the basis for the Rescind/Reinstate Decision.  United States Department of the Interior Assistant

Secretary Joseph Balash signed concurring in the Rescind/Reinstate decision, making it the

Bureau's final decision and rendering the decision ineligible for appeal to the Interior Board of

Land Appeals.

## LEGAL BACKGROUND

47.    Mineral leasing on more than ninety percent of the land that is the subject of the

Leases is governed by 16 U.S.C. § 508b.  This provision allows the Secretary of the Interior to

permit mineral prospecting, development, and utilization on certain lands in the national forests

in Minnesota that are withdrawn from the mining laws of the United States.  *Id.*  In doing so, the

Secretary of the Interior must act in the best interests of the United States.  *Id.*  The Secretary of

the Interior cannot permit mineral development or utilization on § 508b lands without the

consent of the Secretary of Agriculture.  *Id.*

48.    In determining whether to consent to mineral development or utilization on

§ 508b lands, the Forest Service acting for the Secretary of Agriculture is bound by the

Wilderness Act, Boundary Waters Act, and the National Forest Management Act (NFMA).  The

Wilderness Act makes the Forest Service responsible for preserving the wilderness character of

the Boundary Waters, including by protecting the Boundary Waters from potentially harmful

external activities.  *See* 16 U.S.C. § 1133(b).  The Boundary Waters Act directs the Forest

Service to "minimize to the maximum extent possible, the environmental impacts associated

with mineral development affecting" the Boundary Waters and Mining Protection Area.  Pub. L.

95-495, §§ 1-2, 92 Stat. 1649 (1978).  NFMA requires the Forest Service to consider wilderness,

habitat, recreational, spiritual, non-extractive business, and other non-mining values on National Forest System Lands when managing those lands. *See* 16 U.S.C. § 1600(2)-(3).

49.     Mineral leasing on the remainder of the land that is the subject of the Leases is governed by 16 U.S.C. § 520. This provision allows the Secretary of Agriculture to permit mineral prospecting, development, and utilization on forest lands acquired under the Weeks Act. *Id.* In doing so, the Secretary of Agriculture must act in the best interests of the United States. *Id.* Section 402 of Reorganization Plan No. 3 of 1946 transfers the functions of the Secretary of Agriculture under § 520 to the Secretary of the Interior, but provides that the Secretary of the Interior may only authorize mineral activity when the Secretary of Agriculture determines that it will not interfere with the primary purposes for which the land was acquired. The Bureau, acting for the Secretary of the Interior, considers environmental impacts before granting a lease under Section 402 of Reorganization Plan No. 3 of 1946. 43 C.F.R. § 3507.19(b).

50.     The Federal Land Policy and Management Act (FLPMA) requires the Bureau to "manage the public lands under principles of multiple use and sustained yield," and to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732. These principles require balancing the potential economic benefits of additional mining against the possible risks to environmental and cultural resources.

51.     16 U.S.C. § 508b, 16 U.S.C. § 520, Section 402 of Reorganization Plan No. 3 of 1946, and FLPMA ("the Leasing Statutes") require the Bureau to consider environmental values on public lands on and around the Leases, including the Boundary Waters, in exercising its discretion with respect to the Leases.

CAUSES OF ACTION

COUNT I—ACTION WITHOUT LEGAL AUTHORITY

52.     The Bureau's December 15, 2016, decision was final.

53.     The Leases expired when Twin Metals received the Bureau's December 15, 2016, decision.

54.     The Bureau had no statutory, regulatory, or inherent authority to rescind its December 15, 2016, decision and/or to resurrect and reinstate expired Leases.

55.     The Bureau therefore acted without authority in issuing the Rescind/Reinstate Decision.  Its action is of no effect and should be held unlawful and set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

COUNT II—ARBITRARY LEASE REINSTATEMENT

56.     The 2004 Leases are fully integrated contracts, and there is no ambiguity in their renewal terms.  They are preference right leases that preserve the Bureau's authority to deny a subsequent renewal.

57.     The Bureau's denial of renewal in 2016 was authorized by the 2004 Leases, was required by the Forest Service's refusal to consent, and resulted in the expiration of the Leases.

58.     The Bureau's Rescind/Reinstate Decision is based on an erroneous interpretation of the Leases, relying on an unjustified examination of extrinsic materials, and resulted in an arbitrary conclusion that the Bureau lacked authority to deny a third renewal of the Leases.

59.     Even if it were necessary to resort to extrinsic evidence to interpret the 2004 Leases, the Jorjani Opinion's analysis misinterpreted the 1966 Leases and is also contrary to the evidence relating to the 1989 renewal.

60.     As a result of the Bureau's arbitrary conclusion that it lacked authority to deny a third renewal of the Leases, in issuing the Rescind/Reinstate Decision, the Bureau unlawfully abdicated duties imposed by the Leasing Statutes to protect the lands and waters of the Superior National Forest and the Boundary Waters, and to consider the value of multiple uses of those lands, which plaintiffs' members use and enjoy.

61.     The Bureau's Rescind/Reinstate Decision is arbitrary and capricious and not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and violates the Leasing Statutes.

## PRAYER FOR RELIEF

Therefore, plaintiffs respectfully request that the Court:

1.     Declare that the defendants have acted without authority in issuing the Rescind/Reinstate Decision;

2.     Declare that defendants have violated the Leasing Statutes by arbitrarily adopting an erroneous interpretation of the leases that would constrain the Bureau and the Forest Service from fulfilling their statutory obligations with respect to the leased land and surrounding public lands, including the Boundary Waters;

3.     Vacate the Bureau's Rescind/Reinstate Decision;

4.     Enter any other appropriate injunctive relief to ensure that the defendants comply with the Leasing Statutes and the Administrative Procedure Act, and to prevent irreparable harm to the plaintiffs and to the environment until such compliance occurs;

5.     Award plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6.     Grant such other relief as the Court deems just and proper.

Dated this 25th day of June, 2018.

Respectfully submitted,

_s/ Eric P. Jorgensen_
Eric P. Jorgensen (DC Bar No. 88897)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

_s/ Erin Whalen_
Erin Whalen (_pro hac vice_ pending)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ewhalen@rearthjustice.org

_s/ Janette K. Brimmer_
Janette K. Brimmer (_pro hac vice_ pending)
EARTHJUSTICE
705 Second Avenue, Suite 203
Seattle, WA  98104
T: 206.343.1029
E: jbrimmer@earthjustice.org

_Attorneys for Plaintiffs The Wilderness Society,_
_Izaak Walton League of America, and Center for_
_Biological Diversity._